COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

|  |  |
|---|---|
| LISA MURPHY, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * Civil Action No.11-02430-B |
| | * |
| BOSTON SCIENTIFIC CORPORATION | * |
| | * |
| Defendant. | * |
| | * |

## AMENDED COMPLAINT AND JURY DEMAND

### NATURE OF THE CASE

1.  Plaintiff Lisa Murphy brings this Complaint against her former employer, Boston

Scientific Corporation, seeking compensation and damages for discrimination in violation

of Chapter 151B of Massachusetts General Laws.  The claims include discrimination,

retaliation, breach of contract, and breach of the covenant of good faith and fair dealing.

### PARTIES

2.   Plaintiff Lisa Murphy, hereinafter, "Murphy," is an a single adult individual residing at

66 Milk Street, Westborough, Massachusetts.

3.  Boston Scientific Corporation, hereinafter, "BSC," is a corporation organized and

existing under the laws of Delaware, having its principal place of business at 1 Boston

Scientific Place, Natick, Massachusetts.

## FACTS

4.   Murphy has exhausted her administrative remedies and timely satisfied all the prerequisites to suit under G.L. c. 151B.

5.   Murphy began working for BSC as legal secretary in 1999.

6.   Murphy met all her obligations to BSC and received promotions throughout her employment at BSC.

7.   On October 11, 2000, Murphy's then supervisor, Mr. F. Ty Edmonson , hereinafter, "Edmonson" wrote a memorandum to Gilman. <u>See</u>, **Exhibit A**.

8.   Gilman forwarded this memorandum to BSC's General Counsel, Paul Sandman, with the following endorsement, "Paul, This recommendation has my full support."

9.   All BSC employees , including legal secretaries, are entitled to receive benefits under a tuition reimbursement benefit plan.

10.   In 2003, Edmonson  informed Murphy that BSC allocated funds to hire a new attorney for 2004.

11.   In 2004, Edmonson informed Murphy that BSC had allocated funds to hire a new attorney in 2005, and informed Murphy, "That is your job."

12.   Edmondson, as a manager in charge and an agent of BSC, held actual or apparent authority to make  representations to employees, including the express representation Edmonson made to Murphy, "That is your job."

13.   Murphy reasonably relied upon the representations of BSC authorized agent, Edmonson, in undertaking to perform duties that legal secretaries who had not been informed that they would be hired as attorneys did not perform.

14.   Beginning in 2004, in reliance upon Edmonson's statement, in addition to her regular legal secretary duties, Murphy performed all work of junior attorneys such as negotiating contracts related to export licensing with BSC outside counsel, often requiring overtime hours for which she was not paid.

15.   No legal secretary in the International Legal Group (ILG) performed contract negotiation without outside counsel for export licensing or any work assigned to junior attorneys except Murphy.

16.   Murphy later participated in a sexual harassment investigation related to Edmonson.

17.   After Edmondson resigned, several months lapsed without BSC replacing Murphy's former supervisor.

18.   Murphy continued to perform her job acceptably, including all the work usually assigned to junior attorneys, such as negotiating contracts related to export licensing with BSC outside counsel.

19.   Neil Johnson became Murphy's supervisor in September, 2004.

20.   Murphy successfully completed her law degree and inquired about BSC hiring her as an attorney.

21.   During Murphy's 2004 annual review, Johnson admitted to Murphy that Gilman asked Johnson to "strike" junior counsel duties formerly assigned to Murphy and to assign those duties to the "new attorney" that BSC had budgeted for the International Law Department in 2005.

22.   Neil Johnson informed Murphy during her annual review that based upon Gilman's recommendation, BSC would not promote Murphy to an attorney position.

23.  At about this time, BSC hired Murphy's male colleague, Bill Shaw, as an attorney.

24.  Upon information and belief, the starting salary for attorneys at BSC during the relevant timeframe was 100k.

25.  Bill Shaw had not participated in any sexual harassment investigation or made any formal internal complaint about management or Claudia Gilman, the Director of the ILG, as Murphy had complained.

26.  Johnson admitted to Murphy that, instead of hiring Murphy as an attorney, Johnson, Gilman, and others had engaged discussions with BSC employment attorneys about how BSC could "help" Murphy leave BSC, in spite of the successful performance of her duties.

27.  At all relevant times, Murphy had no present intention to leave BSC.

28.  From 2004 until August 15, 2008, BSC/Gilman created an environment hostile to Murphy in retaliation for Murphy's formal internal complaint by convening Murphy's colleagues to yell disparaging comments at Murphy, and by refusing to speak about her concerns privately when asked .

29.  From 2004 until August 15, 2008, BSC/Gilman created an environment hostile to Murphy in retaliation for her formal internal complaint by excluding Murphy from meetings Murphy had formerly been invited to attend.

30.  From 2004 until August 15, 2008, BSC/Gilman created an environment hostile to Murphy in retaliation for her formal internal complaint by announcing to Murphy's colleagues at her graduation party that Gilman intended to hire a "new attorney."

31.  Gilman's failure to hire Murphy for an open attorney position upon completion of her

legal studies was in bad faith.

32. In September 2005 Ms. Murphy took a medical leave due to various serious health conditions.

33. Murphy's health conditions impair her major daily functions and have required multiple surgeries and time to rehabilitate from the surgeries.

34. BSC does not dispute that Murphy was disabled.

35. Ms. Murphy long-term disability from September 2005 through August 2007 as approved by BSC.

36. By August 2007 Ms. Murphy still suffered from chronic pain, but her health had improved to the extent that she was capable of performing the essential functions of her former position at BSC easily with a defined accommodation.

37. In October 2007 Ms. Murphy submitted medical information to BSC documenting the proposed accommodation needed to transition back to work.

38. In September , 2007 Murphy requested a defined initial period of part-time work, a brief hourly stretch break, and a modification to her work station .

39. In response, BSC rejected Ms. Murphy's proposal by written letter terminating her employment by letter dated October 30, 2007.

40. Upon information and belief, Murphy's position remained open and BSC sought to fill it.

41. In October 2007, Ms. Murphy sought reasonable and defined accommodation from BSC.

42. BSC refused to engage in the interactive process to discuss Ms. Murphy's requests for reasonable accommodations and terminating her employment in the fall of 2007.

43. In July 2008 Murphy reapplied for employment at BSC for a posted position of Contract

5

Specialist.

44. Murphy was fully qualified and ideally suited to perform the position of Contract Specialist based on her prior experience at BSC.

45. Murphy informed her interviewers at BSC of her former medical leave and her need for minor accommodations to her work station.

46. On August 15, 2008 Murphy learned that BSC had chosen another candidate for the Contract Specialist position outside her protected class who did not require any accommodation.

47. Among other things, BSC's statement that the hired candidate was selected because she appeared "more enthusiastic" is a pretext for bias on the basis of disability.

48. Among other things, BSC's statement that the hired candidate was selected because she appeared "more enthusiastic" is a pretext for retaliation.

49. Murphy has suffered damages as a result of the defendants' conduct.


## CLAIMS FOR RELIEF

### COUNT I - Disability Discrimination

50. Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

51. Starting in August 2007, Murphy was a qualified individual with a disability within the meaning of M.G.L. Chapter 151B §1(16) because she was capable of performing the essential functions of her position with reasonable accommodations.

52. In our about August, 2008, BSC violated M.G.L. c. 151B by failing to hire Ms. Murphy

because she was a qualified individual with a disability within the meaning of M.G.L.

Chapter 151B §1(16) or was perceived as being disabled.

53.     As a direct and proximate result thereof, Ms. Murphy suffered and continues to suffer

loss of income, loss of benefits, loss of personal and professional reputation, loss of

professional opportunities and other losses including mental suffering.


**COUNT II - Retaliation**

54.     Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of the

Complaint as if fully set forth herein.

55.     In our about August, 2008, BSC violated M.G.L. c. 151B by retaliating against Ms.

Murphy by failing to hire her.

56.     In or about August, 2008, BSC violated 151B by retaliating against Ms. Murphy because

she sought reasonable accommodations.

57.     As a direct and proximate result thereof, Ms. Murphy suffered and continues to suffer

loss of income, loss of benefits, loss of personal and professional reputation, loss of

professional opportunities and other losses including mental suffering.


**COUNT III  -**   Breach of Implied-In-Fact Contract

59.     Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of the

Complaint as if fully set forth herein.

60.     An implied-in-fact contract was entered into by the parties whereby Murphy would

successfully complete her law degree, during which time BSC would receive the benefit

from Murphy's legal studies by receiving work regularly performed by a junior

attorney, while compensating Murphy as a legal secretary. A memorandum condoning

Edmonson's authority is attached and incorporated by reference as **Exhibit A.**

61.     Plaintiff Murphy performed or stood ready, willing, and able to perform  her  obligations

under their Agreement and satisfied all the conditions precedent to the performance of the

Agreement, including the successful completion of  her law degree and the maintenance

of exemplary performance  ratings.

62.     Defendant BSC have breached and continue to breach the Agreement by, among other

acts:

a. Among other things, Defendants breached the implied-in-fact Agreement by

refusing to hire Murphy for a "new attorney" position as Edmonson represented to Murphy

BSC would do upon completion of her legal studies;

b. Among other things, Defendants breached the implied-in-fact Agreement by

creating a hostile work environment following Murphy's formal internal complaint;

c. Among other things, Defendants breached the implied-in-fact Agreement by

refusing to hire Murphy as an attorney where another similarly-situated male graduate

from Suffolk Law School, Bill Shaw, who had not participated in such complaints was

hired as an attorney immediately upon graduation, without requiring that such male

graduates demonstrate satisfactory bar results before hiring him as an attorney;

d. Among other things, Defendants breached the implied-in-fact Agreement by

"striking" junior counsel duties formerly assigned to Murphy and to assign those duties to

the "new attorney" that BSC had budgeted for the International Law Department in 2005, even though Edmonson expressly represented to Murphy that

e. Among other things, Defendants breached the implied-in-fact Agreement by engaging discussions with BSC employment attorneys about how BSC could "help" Murphy leave BSC.

f. Among other things, Defendants breached the implied-in-fact Agreement by creating, permitting, and failing to intervene to prevent an environment hostile to Murphy in retaliation for Murphy's formal internal complaint by disparaging Murphy, and by refusing to speak about her concerns privately when asked .

g. Among other things, Defendants breached the implied-in-fact Agreement by creating, permitting, and failing to intervene to prevent an environment hostile to Murphy in retaliation for her formal internal complaint by excluding Murphy from meetings Murphy had formerly been invited to attend.

h. Among other things, Defendants breached the implied-in-fact Agreement by creating, permitting, and failing to intervene to prevent an environment hostile to Murphy by announcing  to Murphy's colleagues at Murphy's graduation party that Gilman intended to hire a "new attorney."

63.     As a direct and proximate result defendants' actions, Murphy was damaged.

**COUNT IV -** Breach of the Covenant of Good Faith and Fair Dealing

64.     Plaintiff hereby realleges and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

65.     Plaintiff Murphy entered into an implied-in-fact agreement with BSC in order to, among

other things, benefit from the development of the parties' respective goodwill and interest

in the attainment of a law degree without damaging Plaintiff' rights to job security, lost

wages, reputation, professional opportunities, and a work environment free from

discrimination and retaliation.

66.     All implied contracts in Massachusetts include an implied covenant of good faith and fair

dealing, which requires that neither party take any action that will deprive the other of the

benefit of the implied contract.

67.     Defendants further understood that the reason Murphy invested countless personal hours

developing her knowledge and applying her expertise in the types of contracts and

litigation BSC junior attorneys routinely handle was because she wanted to maximize the

value of her legal education by completing  her law degree while working for BSC, who

she reasonably believed would hire her as an attorney, because Edmonson expressly

represented this to Murphy in 2004.

68.     BSC breached the implied covenant of good faith and fair dealing by, among other

things:

        a.      Refusing to engage in the interactive process to discuss Ms. Murphy's

requests for reasonable accommodations and terminating her employment in the fall of

2007;

        b.      Refusing to rehire Murphy for employment at BSC for a posted position of

Contract Specialist in July/August of 2008 after Murphy informed her interviewers at

BSC of her former medical leave and her need for minor accommodations to her work

station.

69.   In violation of this implied covenant of good faith and fair dealing, and as a direct and

proximate cause thereof, BSC has damaged, deprived and continues to damage and

deprive Murphy valuable rights to the implied-in-fact contract , including the value of job

security, lost wages, benefits, lost professional prospects, and professional reputation

untainted by the effects of discrimination and retaliation.


**WHEREFORE**, Plaintiff demands judgment in her favor and prays that this Court:

a.      award Plaintiff compensatory damages, including lost wages and benefits,

emotional distress, interest on the compensatory damages;

b.      award punitive damages for Defendant's willful conduct;

c.      award Plaintiff's reasonable attorneys' fees; and

d.      grant such other and further relief as this Court deems just.


Respectfully submitted,

Lisa Murphy
By her attorney,

Date:   October  24, 2011

/s/ Margaret G. Plaza
Margaret G. Plaza, BBO # 668467
Plaza Law Group
275 Grove Street, Suite 2-400
Newton, MA 02466
(617) 663-5701 (telephone)
(617) 663-4801 (facsimile)
mplaza@plazalawgroup.com


11

# EXHIBIT A

*Claudia — I agree with you and support Ty's recommendation. This is thorough and persuasive.*

**RECEIVED**
**OCT 2 0 2000**
**PAUL W. SANDMAN**

## Boston Scientific

INTEROFFICE MEMORANDUM
PRIVATE AND CONFIDENTIAL

*Paul — This recommendation has my full support. We do have available funds in our ILD 2000 budget. We appreciate your endorsement, please. Thank you very much Claudia*

| | |
|---|---|
| DATE: | October 11, 2000 |
| TO: | Claudia Gilman |
| FROM: | F. Ty Edmondson |
| SUBJECT: | Lisa Murphy -- Tuition costs |

Claudia:

As you know, Lisa Murphy is going to be applying to law school. In order to prepare for her LSATs, she has just completed a LSAT review/prep class through Kaplan. I understand the cost of this course is approximately $1,000.00. I recommend that we offer to reimburse Lisa for the cost of the course, especially as she has now taken the LSAT.

### Background

Lisa's background, as reflected in her attached resume, would make her a compelling candidate for BSC's International Legal Department if she successfully completes her legal education. She speaks three languages and has a great deal of practical and personal experience with markets BSC may enter in the next 5-10 years in Eastern Europe/Russia.

### Analytical and Writing Skills

Lisa has consistently displayed excellent analytical skills as a member of the International Legal Department. She has a very real, active curiosity about the reasons attorneys make decisions and has shown a marked ability to anticipate how we arrive at those decisions. She is also interested in a variety of subjects, from contracts to litigation.

### Performance to Date

Lisa's performance to date with the company has been outstanding. She is a dedicated and hard-working person, more than willing to adjust her own schedule to the company's needs, and enjoys working in an international business environment. The International Business team recently used Lisa as a model for HR in their efforts to recruit new support staff.

I would strongly recommend Lisa to BSC as an international attorney upon her completion of her legal studies.

**BSC Education Policy**

Unfortunately, the standard BSC education policy (copy attached) would not seem to provide reimbursement for Lisa's LAT course. However, I checked with Bill Shaw and he indicates Paul Sandman paid for his LSAT prep class out of the Legal budget as a matter of principle (and kindness). I also ran the idea by Andrea Sinclair and she sees no problem with us adopting a similar approach either from a BSC policy standpoint or in particular regards to Lisa.

I think supporting this expansion of talents and experience is the right thing to do. Beyond that, I think it is a very efficient way of fostering employee retention, simply on the ratio of the amount of good psychic points we earn with the emp oyee per dollar of expense.

If you approve, I would like to privately share our support with Lisa.

Workforce Prioritization Worksheet
Executive Committee Member _____ Jeff Goodman

| "Ranked" Hire Date (Q1, Q2, Q3, Q4) | Business Title | Location | Function | Individual Approval Received From (leave blank) | Business Unit | Hiring Manager | Indicate Add or Replacement. Do not/Connect replacements | Regular or Temp | "General Statement" # Duties | "General Statement" Enter | "General Statement" # FTE or FTE | Additional Position Information | Critical position (Yes/No) | "Budgeted" Immediate/Cash | "Budgeted" Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q3 | General | EU - TBD | Legal | | Int'l HQ → Paris | Laura Wiederman → Senior Counsel | Add | Regular | 1 | Sr. Counsel Director | A | Critical role to support aggressive business growth. Europe too large and complex to service w/o current resource.   Ten new countries added.  Compliance potentially at risk and delay in filling this position compromise our ability to service adequately.  This lawyer will provide legal support at the country and regional level (especially Nordic product and Southern Europe items), provide many legal (throughput on all business products and transactions, and provide regular, critical training on legal issues to managers and employees.  Urgent or immediate place us to support.   - near-term compliance initiatives by related functions (Regulatory, Quality),   - critical programs, as well as   - proxy stream of NEO initiatives requiring input and analysis under CMS Sec.   WE recruit for a lawyer who can be highly effective and proactive immediately, with experience in the healthcare industry (device and pharmaceutical sectors), and regional countries/languages. | N | CC2 | 100.1 |

Late Spring/Summer 2005

| 2 Q3 | Cleared | Notice? | Legal | Int'l Operations | Claudio Gianas | Add | Regular | Base Business | A | | Y, Q1 '06 | 10/05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 Q4 | Admin | France | Local | Int'l Operations | Laurie Weissman | Add | Regular | | | • Near term compliance initiatives by related functions (Regulatory, Quality). • Critical programs, as well as • steady stream of NBD initiatives requiring input and analysis under OUS laws (many coming out of trend). | | |
| 4 Q4 | Admin | Noack | Local | Int'l Operations | Claudio Gianas | | Regular | | | Large increase in country support required — needed to support Legal concerns and provide certain training to local country compliance assistants. | Yes | |
| 5 Q4 | | | | | | | | | | Large increase in country support required — needed to support Legal concerns and provide certain training to local country compliance assistants. | Yes, Q1 '06 | 10/05 |
| 6 | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | |

**Notes:**

Business Drivers. Select which of the following most appropriately describes the need for this position:
1) Supports Base/Core Business for 2005 and first half 2006
2) Supports a Key Business Initiative
3) Related to Integration of VG Acquisition
4) Supports the BSC Strategic Investment List

Headcount Priority A or B. A indicates a Must Have priority, B indicates a Nice to Have.

A) Must Have
  Supports 2005 Revenue and/or Operating Plan/etc
  Supports Q3-Q4 Critical Programs
  Integration support for approved acquisitions
  Part of the BSC Strategic Investment List with "time to first revenue" in 2006
  Supports near term compliance items in Regulatory and Quality

B) Nice to Have
  Longer-term, 2007/2008, impact with project identified
  Acceleration of Planned Acquisition Integration/Implementation
  Remaining BSC Strategic Investment List, "time to first revenue" and beyond